## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                      PLAINTIFF

v.          Criminal No. 06-50064-001

HOLLIS WAYNE FINCHER                                          DEFENDANT

### O R D E R

On July 3, 2007, the captioned case came on for evidentiary hearing with regard to questions about the financial status of defendant Hollis Wayne Fincher ("Fincher"), and his eligibility for appointment of counsel under the Criminal Justice Act. The background leading up to the Court's call for this hearing, the issues presented, and the Court's conclusions as to those issues, are set out in this Order.

1.   Background:

Fincher was arrested on November 9, 2006, on a Warrant based on a Complaint charging him with possession of a machine gun in violation of **18 U.S.C. §922(o)**. At his initial appearance on that date, Fincher executed a document entitled "Financial Affidavit In Support Of Request For Attorney Or Other Court Services Without Payment Of Fee" ("Financial Affidavit"). In the Financial Affidavit, Fincher indicated that he owned a home and 120 acres in Fayetteville, Arkansas (the "Property"), and gave the value of the Property as "unknown." No information as to liens against the Property was given.

The Financial Affidavit is part of the paperwork required

under the Court's Criminal Justice Act Plan (the "Plan"), which is a "plan for furnishing representation for any person financially unable to obtain adequate representation" under **18 U.S.C. §3006A.**

Pursuant to the Plan, legal representation is furnished at public expense to persons charged with felony crimes who are "financially eligible." The only purpose for completing the Financial Affidavit is to obtain legal representation and related services at public expense under the Plan.

On the basis of the Financial Affidavit, attorney David Dunagin ("Dunagin") was appointed to represent Fincher. Dunagin represented Fincher until December 13, 2006, when he was allowed to withdraw in favor of attorney Oscar Stilley ("Stilley"), who had been retained by Fincher.

Fincher's case was tried to a jury, and on January 12, 2007, he was convicted of both charges of a two-count Indictment, possession of a machine gun, in violation of **18 U.S.C. §§922(o)** and **924(a)(2),** and possession of a sawed off shotgun not registered, in violation of **26 U.S.C. §§5841, 5861(d)** and **5871.**

On March 8, 2007, at Fincher's request, Stilley was allowed to withdraw and another attorney, Shannon Blatt ("Blatt"), was appointed to represent Fincher.

A Presentence Investigation Report was prepared in connection with Fincher's sentencing. In the section entitled "Financial Condition: Ability to Pay," the Report stated that Fincher had

"recently transferred" the Property to his two daughters, jointly, by quit claim deed executed on January 29, 2007, but that his wife continued to live on the Property.

On June 22, 2007, Fincher was sentenced to concurrent terms of 78 months imprisonment on each count of conviction. Although **18 U.S.C. §3571** authorized a fine of up to $250,000, and the Guidelines suggested a fine range of $12,500 to $125,000, the Court -- acting under the belief that Fincher had no significant assets -- imposed a fine of only $1,000.

Following sentencing, Fincher moved for release on bond pending a designation of the Bureau of Prisons facility where he will serve his sentence, and for release on bond pending appeal.

The Court conducted a hearing on the release request and ultimately agreed -- with no objection by the government -- that Fincher could be released on $100,000 bond pending his designation.[1]

Fincher indicated his inability to post bond in that amount, whereupon it was noted by the Court that the Property might be used to secure the bond. Fincher protested that he no longer owned the Property and expressed his fears that the Property might be lost if it were to be pledged to secure a bond. The Court assured Fincher that if he complied with the conditions imposed upon him, the Property would be in no danger of being lost.

---

[1]The motion for bond on appeal was taken up after it ripened with the filing of Fincher's Notice Of Appeal was filed, and denied on June 29, 2007.

Fincher and his daughters then agreed to pledge the Property to secure the $100,000 bond.

In connection with preparing the paperwork pledging the Property to secure the bond, the Court became aware that when Fincher quitclaimed the Property to his daughters, he received essentially no consideration for it,[2] and that he had reserved life estates in the Property to himself and his wife.  This awareness prompted the Court to, for the first time, carefully examine Fincher's Financial Affidavit and the deed of conveyance whereby he transferred title to the Property to his daughters.

    2.  <u>The substantive issues presented</u>:

The foregoing series of events presented three issues:

*    First, it called into question the veracity of the Financial Affidavit and, consequently, Fincher's eligibility for services under the Plan.  If, at the time Fincher executed the Financial Affidavit, the Property had significant value, it would be most unlikely that Fincher qualified for appointment of counsel under **§3006A.**  In addition, the conveyance of the Property would not necessarily make him so qualified.

*    Second, it called into question the basis -- in part -- of the sentence that had been pronounced.  The Court had varied from the Guidelines, and significantly reduced the fine imposed on Fincher, based on its understanding that Fincher was financially

---

[2]The Quit Claim Deed recites consideration of "One Dollar ($1.00) and other good and valuable consideration."

unable to pay a fine.

        *    Finally, the Court had accepted a mortgage on the Property to secure Fincher's bond in the sum of $100,000 for release pending the designation of the Bureau of Prisons facility where he will serve his sentence.

        These circumstances -- all coming into focus at the conclusion of Fincher's sentencing -- obliged the Court to further investigate Fincher's financial condition, most particularly the value of the Property and the circumstances of its conveyance.  An evidentiary hearing was conducted on July 3, 2007, and the Court thereafter obtained the services of Tom Reed, of Reed & Associates, Inc., to prepare a professional appraisal of the Property.  The report of that appraisal has now been submitted, and this matter is ripe for decision.

        3.   The jurisdictional issue:

        Initially, it is necessary to consider and determine whether this Court has jurisdiction to resolve the issues presented, given that Fincher has filed a Notice Of Appeal.  The general rule is that

>        a federal district court and a federal court of appeals
>        should not attempt to assert jurisdiction over a case
>        simultaneously.  The filing of a notice of appeal is an
>        event of jurisdictional significance -- it confers
>        jurisdiction on the court of appeals and divests the
>        district court of its control over those aspects of the
>        case involved in the appeal.

**Griggs v. Provident Consumer Discount Co.**, **459 U.S. 56, 58 (1982).**

Issues not before the appellate court may be considered by the district court during the pendency of an appeal, however. **Harmon v. U.S. Through Farmers Home Administration**, 101 F.3d 574 **(8th Cir. 1996)**. Because there is no indication that either party has challenged Fincher's eligibility for appointment of counsel on appeal, the Court concludes that the rule in **Griggs** does not deprive it of jurisdiction to take up that issue.

The Court's concern about the fine imposed at sentencing presents a much closer question. The Eighth Circuit has said, citing **Griggs**, that "while an appeal is pending, the district court may not reexamine or supplement the order being appealed." **State ex rel. Nixon v. Coeur D'Alene Tribe**, 164 F.3d 1102 (8th **Cir. 1999)**. It has also held that a district court may not entertain a motion under **F.R.Cr.P. 35** during the pendency of an appeal, explaining that the rule in **Griggs**

> serves two important interests. First, it promotes judicial economy for it spares a trial court from considering and ruling on questions that possibly will be mooted by the decision of the court of appeals. Second, it promotes fairness to the parties who might otherwise have to fight a confusing "two front war" for no good reason, avoiding possible duplication and confusion by allocating control between forums.

**U.S. v. Ledbetter**, 882 F.2d 1345, 1347 (8th Cir. 1989)(internal citation omitted).

Given these statements of the law, the Court concludes that it has no jurisdiction to revisit Fincher's sentencing while the

-6-

appeal is pending.  Accordingly, it will leave that issue to the appellate court unless and until the matter is remanded to this Court.

    4.   <u>The authority for appointment of counsel</u>:

    The authority for appointment of counsel in a criminal case is found in **18 U.S.C. §3006A**, which states, in **§3006A(a)(1)**, that "[r]epresentation shall be provided for any financially eligible person who . . . is charged with a felony. . . ."

    The term "financially eligible" is not defined in **§3006(A)**, but the corresponding term "financially unable to obtain counsel" is defined in the Plan, as follows:

> A person is "financially unable to obtain counsel" within the meaning of this Plan if his or her net financial resources and income are insufficient to enable him or her to obtain qualified counsel.

**IV.B.1.**

    The concept is fleshed out in **<u>U.S. v. Brockman</u>, 183 F.3d 891 (1999)**:

> The Criminal Justice Act ("CJA") was passed by Congress in 1964 "to insure that defendants who are financially unable to afford trial services necessary to an adequate defense are provided them in accordance with the Sixth Amendment to the United States Constitution."  Counsel must be appointed under the CJA if the court is satisfied after "appropriate inquiry" that the defendant is "financially unable to obtain counsel."  When requesting the appointment of counsel, the burden is on the defendant to show that he is "financially unable" to afford representation.  Financial inability to pay "is not the same as indigence or destitution," and doubts as to eligibility should be resolved in a defendant's favor.

**183 F.3d at 897** (internal citations omitted).

    5.   <u>The evidence regarding Fincher's financial status</u>:

    (a)   During the evidentiary hearing on July 3, 2007, Fincher testified that, at the time of his initial appearance, he told the Magistrate Judge (or a member of her staff) that he wanted an attorney and that he had no money.  He said he answered questions from a staffer about his financial status; that the staffer used that information to fill out the Financial Affidavit; and that he then signed the Financial Affidavit.

    Fincher testified that he told the staffer that he owned 120 acres, and that property in the vicinity had sold for between $2,000 and $4,000 per acre.  He further testified that he did not recall whether he told the staffer that the value of the Property was "unknown."

    The Court does not credit Fincher's testimony that he mentioned to the staffer any per acre values for land sales in the vicinity of the Property, or his testimony that he does not recall telling her its value was unknown, for three reasons:

    *   First, the Court does not believe that the Magistrate Judge's staffer would have written that the value of the Property was "unknown" if Fincher had not told her that.  If he did not tell the staffer the value was unknown, and did tell her that land in the area was selling for $2,000 to $4,000 per acre, she would have had every reason to inquire further about the value of the

Property and no reason whatsoever -- on her own initiative -- to state that its value was "unknown."

    *    Second, Fincher signed the Financial Affidavit under penalty of perjury, and even wrote above his signature "I believe the info is true."  Fincher testified at the hearing that he did not know what was on the Financial Affidavit when he signed it, because he did not have his reading glasses and could not see it. The Court does not believe that Fincher would have written in his own hand that the information in the affidavit was true if he did not know what was in the Financial Affidavit.  Indeed, it would be misleading at best, and quite possibly dishonest, if he swore the information was true when he did not know its contents.

    *    Third, Fincher testified that he could not "morally" have mortgaged or sold the Property to pay for his defense, because it was family property to be handed down from generation to generation.  He testified that the Property had no market value to him, because he would not sell it for any amount of money, and that he would "sit in jail" before he would sell it.  It was clear throughout the evidentiary hearing that Fincher never had any intention of mortgaging or selling any part of the Property to pay for his defense, and that he intended to obtain appointment of counsel to represent him at public expense.

    For these reasons, the Court does not believe that Fincher told the staffer about comparable sales figures, and does believe

that he told her the value of the Property was unknown.

The Court also concludes that Fincher was not truthful when he told the staffer that the value of the Property was "unknown." While the Court does not credit Fincher's testimony *that he told the staffer* he was aware of sales of property in the vicinity for between $2,000 and $4,000 per acre, his testimony indicates that he *was actually* aware of such sales.  Based on those sales, he was also aware that his 120 acres might well be worth $240,000 to $480,000.[3]  Reed's appraisal placed the market value of the Property at $455,000, thus confirming that Fincher actually had a very accurate notion of the value of the Property when he signed the Financial Affidavit.

From the foregoing, the Court concludes that the Financial Affidavit contained a material misrepresentation of fact, and that Fincher knew of the misrepresentation when he signed the document with the intent of obtaining an appointed attorney.

The Court also concludes that at the time he signed the Financial Affidavit, Fincher did not qualify for appointment of counsel.   It is clear -- without the need for citation of authority on the proposition -- that a person who owns, free and clear, real property worth nearly half a million dollars has "net financial resources" sufficient to enable him to obtain qualified

---

[3] Fincher testified that the Property was free and clear of any liens.  Fincher inherited the land from his father, who had inherited it from his father, and Fincher has never mortgaged the Property.

counsel to represent him.

(b)  On the basis of the Financial Affidavit, Dunagin was appointed to represent Fincher.  However, as already noted, Fincher soon retained Stilley to represent him.[4]  Fincher testified at the evidentiary hearing that he understood and expected Stilley would work on his behalf along with his appointed attorney, i.e., that he would have not one but two attorneys representing him.  If the matter had proceeded in the way Fincher expected, one of these attorneys -- Dunagin -- would have been paid out of public funds based on Fincher's claim that he was unable to afford counsel;  the other -- Stilley -- would have been paid on the basis of an agreement between Fincher and Stilley (although the terms of that agreement were not then known to the Court).[5]

At the evidentiary hearing, the Court inquired of Fincher how Stilley came to represent him.  Fincher's testimony on the subject was vague to the point of evasiveness.  He testified that he signed two contracts with Stilley -- one providing for a substantial retainer and hefty hourly fees and the other providing that Stilley would not press Fincher for payment, as long as he

---

[4] The fact that a defendant who has been found qualified for appointed counsel later retains counsel does not necessarily suggest that the initial appointment was in error. It is not uncommon for the family of a criminal defendant to raise funds to pay for retained counsel after counsel is appointed.

[5] Fincher's expectation that both Dunagin and Stilley would represent him was undone when Dunagin promptly moved to withdraw from the case upon Stilley's entry of appearance. This was the proper thing for Dunagin to do, and the motion was granted.

paid $10 per year.

At the Court's request, several days after the evidentiary hearing Fincher produced two documents relating to his contractual relationship with Stilley.  One is a signed contract for legal services, dated December 4, 2006, in which Fincher agrees to pay Stilley a retainer of $25,000; an hourly fee of $295 (with lesser sums for work performed by clerks and "staff attorneys"); and a fee of $4,200 for any full day "involving an overnight stay away from the home of Attorney."

The second document is a cover letter from Stilley to Fincher, dated February 3, 2007.  It purports to transmit for Fincher's "review and consideration" a contract which Fincher has not yet signed.  In it, Stilley states that he wants Fincher "to have the opportunity to think about this as long as you like before you sign off on this agreement."  It also states that Stilley has talked with someone who "said he would be providing some assistance with respect to contributions to your legal defense," and that:

> I told you that I would not oppress you in any way with
> respect to this contract.  If there is an amount due in
> excess of contributions and other payments for your
> defense, if any, you can pay that out in whatever manner
> is convenient to you.
>
> The only thing that I would insist on is that you pay me
> some money each year.  I will not inquire as to your
> finances or try to require you to pay more than you deem
> proper and fair.  If you only pay $10 per year, that is
> your call.  I would not take this case unless I was
> fully convinced that you are an honorable man who would

likewise treat me in a fair and reasonable manner, and
allow me to receive my fee if and when it can be done
without depriving you or your wife of suitable
sustenance.

While the these two documents raise more questions than they
answer, they do make one thing clear: Fincher was not financially
unable to obtain counsel to represent him in his criminal case,
because he did so.

(c)  After Fincher was convicted, and while he was awaiting
sentencing -- and facing the prospect of a fine that could be as
high as $250,000 -- his family consulted attorney Jack Butt
("Butt") about the preparation of a deed conveying the Property to
the Finchers' two daughters, Carol Hale and Connie Fields.  A Quit
Claim Deed was prepared which accomplished this objective, but
which retained in both Fincher and his wife a life estate in the
Property.  This Quit Claim Deed was executed on January 29, 2007.

At the evidentiary hearing, both the Finchers and their
daughters denied that the prospect of the fine had anything
whatsoever to do with the conveyance, but Fincher admitted that he
wanted to get the property "out of my hands," and Fields admitted
that the family had discussed the fact that if there was a fine
and Fincher did not pay it, the Property could be taken to pay it.

Fincher also placed in evidence a letter from Butt to
Assistant U.S. Attorney Chris Plumlee ("Plumlee").  The letter
references a conversation between Butt and Plumlee that took place
on February 6, 2007, about the fact that Fincher had been

-13-

convicted;  that he owned "a family farm in northwest Arkansas which has been in the family for many generations"; and that Butt had "been requested by the family to accomplish a transfer that would ensure its continued ownership by the family."

The testimony of Fincher and Fields, and the Butt letter, along with the close temporal coincidence of Fincher's conviction and the conveyance, are persuasive evidence that Fincher was trying to divest himself of the Property so that it would be unavailable to pay any fine he might be sentenced to pay.  This divestiture also had the effect of tending[6] to make Fincher appear less able to pay a lawyer after his conviction than he had been at his initial appearance.

(d)  On March 6, 2007, Fincher wrote the Court a letter, in which he stated that he had "released Mr. Oscar Stilley from my service as my attorney because of irreconcilable differences," and that he did not "know how to carry on from here."

On March 8, 2007, the Court conducted a hearing with regard to this letter, at which Fincher stated that he was indigent.  The Court finds this to have been a misrepresentation, and further finds that Fincher knew it was a misrepresentation, for the reasons set forth above.  The Court, not realizing the true facts

---

[6]The Court uses the word "tending" advisedly, because it is persuaded that the Quit Claim Deed was probably a fraudulent conveyance as defined in A.C.A. §4-59-204.  The document purported to transfer Fincher's only substantial asset to his daughters, for no consideration, at a time when he was facing criminal penalties, yet allowed Fincher to retain possession of the asset.

-14-

of the matter, appointed Blatt to represent Fincher.

(e)  On May 9, 2007, Blatt filed a motion on behalf of Fincher, seeking production of a transcript at public expense for use at Fincher's sentencing.  The motion stated that Fincher was "indigent and was appointed legal counsel and could not afford to hire an attorney." These representations of indigency were not accurate, for the reasons set forth above.  The Court assigns no responsibility to Blatt for the inaccuracy of these representations -- the Financial Affidavit was filed under seal before Blatt entered the case, and she played no part in the suspect conveyancing -- but the fact is, Fincher was not indigent on May 9, 2007.

6.  Based on the foregoing facts, the Court finds that Fincher was not eligible for appointment of counsel in November, 2006, nor at any time thereafter.  The Court further finds that Fincher executed the Financial Affidavit and conveyed the Property to his daughters with the expectation and intention that he be perceived as financially unable to obtain counsel, when in fact he had net financial resources sufficient to enable him to obtain qualified counsel.

While the Court notes that further investigation should have been conducted on the issue of Fincher's financial status before either Dunagin or Blatt was appointed and that such investigation would have shown that he was not financially eligible for

-15-

appointment of counsel, Fincher is not entitled to rely on or benefit from the fact that such an investigation was not made at an earlier time.   It is not the responsibility of either the government or the Court to disprove entitlement to appointed counsel but, rather, it is the burden of a defendant who requests appointment of counsel to prove that he is unable to afford counsel. **U.S. v. Lefkowitz, 125 F.3d 608 (8th Cir. 1997).**   Not only did Fincher not carry this burden of proof, he misrepresented the state of his financial affairs, under penalty of perjury, for the purpose of obtaining appointed counsel without cost to him.

7.    The remedy for legal services wrongfully obtained:

**18 U.S.C. §3006(A)(c)** provides that

[a] person for whom counsel is appointed shall be represented at every stage of the proceedings from his initial appearance before the United States magistrate judge or the court through appeal, including ancillary matters appropriate to the proceedings.  If at any time after the appointment of counsel the United States magistrate judge or the court finds that the person is financially able to obtain counsel or to make partial payment for the representation, it may terminate the appointment of counsel or authorize payment as provided in subsection (f), as the interests of justice may dictate.

**§3006(A)(f)** provides that

[w]henever the United States magistrate judge or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney, to the bar association or legal aid agency or community defender organization which provided the appointed attorney, . . . or to the court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry

out the provisions of this section.

Because the Court has concluded that Fincher has, at all times since his initial appearance in this matter, been financially able to obtain counsel, it finds that Fincher should be directed to pay into the Registry of the Court, for deposit in the Treasury as a reimbursement for the value of services received, the amounts paid to Dunagin and Blatt.

According to vouchers submitted by Dunagin and Blatt, Dunagin's charges came to $1,168.40, and Blatt's came to $7,189.15.  The Court will, therefore, direct that Fincher pay into the United States Treasury the sum of $8,357.55 as reimbursement for those services.

8.   The pending request for transcripts to be prepared at public expense:

Pending before the Court is a CJA 24 Authorization And Voucher For Payment Of Transcript, which requests the preparation -- at public expense -- of transcripts of all pre-trial, trial, sentencing, and post-trial proceedings in this case.  Given its findings and conclusions herein, the Court declines to sign this CJA 24 Authorization And Voucher For Payment Of Transcript, and will leave Fincher to make his own arrangements for transcripts, or to petition the Court of Appeals for assistance in that regard.

9.   Fincher's eligibility for appointed counsel on appeal:

Under **18 U.S.C. §3006(A)(c)**,

[a] person for whom counsel is appointed shall be represented at every stage of the proceedings from his initial appearance before the United States magistrate judge or the court through appeal, including ancillary matters appropriate to the proceedings.

As a result of this provision, it is the Court's understanding that Fincher is being represented by appointed counsel on appeal. His entitlement to appointment of counsel would not, under ordinary circumstances, be revisited at the appellate level.

The facts and circumstances outlined in this Order persuade the Court that Fincher is not entitled to appointed counsel on appeal, although it is not within this Court's jurisdiction to make a decision on that issue. The Court will, therefore, direct that a copy of this Order be forwarded to the Eighth Circuit Court of Appeals, for its consideration of whether Fincher is entitled to appointed counsel to prosecute his appeal in light of the findings herein.

10.   The sentencing issue:

While the Court is precluded from revisiting the issue of Fincher's fine due to the pendency of his appeal, it is persuaded -- based on the facts set forth in this Order -- that Fincher's sentence should be vacated and he should be resentenced. The Court feels strongly enough about the matter that it will take the unusual course of asking the Eighth Circuit Court of Appeals to remand the matter to this Court, so that it can vacate the

sentence pronounced upon Fincher and resentence him in light of the true facts about his financial condition.

Four considerations impel this unusual course of action:

\* First is the fact that the Court granted a significant downward variance as to Fincher's fine on the basis of its erroneous perception that he was unable to pay a fine within the Guidelines range. The Eighth Circuit has repeatedly held that a sentence may be unreasonable if it is outside of the range justified by the facts of the case. See, e.g., **U.S. v. Tjaden, 473 F.3d 877 (8th Cir. 2007).** The facts as now known are very different from those upon which the Court based Fincher's sentence, and the reduced fine to which Fincher was sentenced may not be justified in light of those facts. Given that the variance was based largely on faulty information supplied by Fincher, the Court believes that Fincher should be resentenced in light of accurate information.

\* Second, vacatur at this point would promote a central tenet of Guidelines sentencing, the reduction of sentencing disparities. "The goal of the Sentencing Guidelines is . . . to reduce unjustified disparities and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice." **Koon v. U.S., 518 U.S. 81, 113 (1996).** While the Court obviously cannot say what sentence it might impose if it should be in a position to resentence Fincher,

-19-

it is committed to the Guidelines goal that similarly-situated defendants should be treated similarly.  This goal is thwarted when the Court bases a sentence on inaccurate information about a defendant's situation.

* Third, the justice system is damaged when it is gamed by a player such as Fincher.  As stated in **U.S. v. Bishop**, **774 F.2d 771, 776 (7th Cir. 1985)**, a "defendant's action in intentionally deceiving the court strikes at the very heart and foundation of the American system of justice."  The system demands honesty from every participant, and it has not had that from Fincher with regard to his financial situation.

* Fourth, judicial and litigant efficiency will be served by allowing the Court to determine Fincher's sentence in light of the true facts prior to appeal, rather than awaiting the conclusion of appeal and possibly triggering a second appeal. Because courts have "the inherent power to correct judgments obtained through . . . intentional misrepresentation," **Bishop**, *supra*, citing **Hazel-Atlas Glass Co. v. Hartford Empire Co.**, **322 U.S. 238 (1944)**, the Court will be able to take up the problems herein described upon the conclusion of Fincher's appeal[7] (unless

---

[7]The Court has considered the various obstacles to resentencing, and finds that they are overcome by the peculiar facts of this case.  F.R.Cr.P. 35(a) does not apply, because it governs only correction of a "sentence that resulted from arithmetical, technical, or other clear error," rather than one which resulted from misrepresentations of the defendant.
    The Constitutional prohibition against double jeopardy does not come into play, because a criminal sentence is not "accorded constitutional finality and conclusiveness similar to that which attaches to a jury's verdict of acquittal." U.S. v. DiFrancesco, 449 U.S. 117, 132 (1980).

he is able to set aside his conviction), but postponing the matter until that time would certainly prolong these proceedings. The Court believes the better route would be to resolve the issue now, before appeal.

**IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED** that Fincher is not now, nor has he ever been at any time material to this proceeding, financially unable to obtain counsel to represent him in this proceeding and that appointments of counsel for him were improvidently made.

**IT IS THEREFORE ORDERED** that Fincher is directed pay into the United States Treasury the sum of $8,357.55 as reimbursement for legal services provided to him by attorneys appointed under the Court's Criminal Justice Act Plan.

**IT IS FURTHER ORDERED** that Fincher's request for transcripts at public expense for the purpose of his appeal is denied.

**IT IS FURTHER ORDERED** that the Clerk of Court furnish a copy of this Order to the Eighth Circuit Court of Appeals, for its consideration of

(a)   whether Fincher is entitled to an appointed attorney to represent him on appeal; and

(b)   whether it will grant this Court's request to remand

---

Nor does Fincher have "legitimate expectations" in the finality of a sentence obtained through his own intentional misrepresentations. "A court must be able to sentence a defendant upon accurate information and when the sentence imposed is based upon fraudulent information provided by the defendant, the court has the inherent power to correct that sentence." Bishop, *supra*, 774 F.2d at 775.

-21-

this matter for vacatur of sentence and resentencing prior to appeal.

**IT IS SO ORDERED,** this 27th day of July, 2007.

**__/s/ Jimm Larry Hendren__**
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**