```
        IN THE UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF ARKANSAS
                FAYETTEVILLE DIVISION
```

**UNITED STATES OF AMERICA**                                     **PLAINTIFF**

    v.        Criminal No. 06-50064-001

**HOLLIS WAYNE FINCHER**                                          **DEFENDANT**

### O R D E R

On the 20th day of January, 2009, the captioned matter came on for hearing, pursuant to remand by the Eighth Circuit Court of Appeals. The government appeared through counsel; defendant appeared in person and was represented by counsel. The Court heard the testimony of witnesses and received documentary evidence, and then took the matter under advisement to allow the parties to file post-hearing briefs.

Briefs have now been filed, and the matter is ripe for decision. The Court has considered the evidence adduced at the January 20, 2009, hearing; the evidence presented at an earlier hearing on July 3, 2007; and defendant's post-hearing brief. Based on all the evidence and other matters properly appearing before it, the Court now makes the following findings and order:

1. When indicted on criminal charges in November, 2006, defendant Hollis Wayne Fincher ("Fincher") applied for and received the services of an attorney appointed to represent him at public expense. Under the Court's Criminal Justice Act Plan, an attorney is furnished at public expense to any criminal defendant financially unable to obtain adequate representation. Financial

inability to obtain counsel does not require a showing of destitution, **U.S. v. Brockman, 183 F.3d 891, 897 (8th Cir. 1999)**, but taxpayer funds should not be used to supply attorneys for defendants who can afford to retain their own counsel.  The burden is on the defendant to show that he is financially unable to obtain counsel, with doubts about eligibility resolved in his favor.  *Id.*  If, after appointment of counsel, the Court finds that a defendant is financially able to obtain counsel or to make a partial payment for his representation, it may terminate the appointment of counsel or direct payment as authorized in **18 U.S.C. §3006A(f)**.

In order to apply for appointed counsel, Fincher completed a Financial Affidavit on November 9, 2006.  In this Financial Affidavit, Fincher indicated that he owned a "home & 120 acres" (the "Property") of "unknown" value in Fayetteville, Arkansas.  It later came to light that on November 9, 2006 -- and up until January 29, 2007[1] -- Fincher owned the Property free and clear of any encumbrances, and that it had an appraised value of between $240,000 and $480,000.  Fincher himself testified that Property in the vicinity had recently sold for between $2,000 and $4,000 an

---

[1] On this date, Fincher's wife, holding his Power of Attorney, executed a Quitclaim Deed which transferred the fee in the Property to their two daughters, and retained a life estate in her and her husband.

acre.[2]

The Court looked into the matter, determined that Fincher was not, in fact, eligible for an appointed attorney, and directed him to reimburse the United States Treasury $8,357.55 for legal services provided to him by attorneys appointed under the Criminal Justice Act Plan.

2.  Fincher appealed this ruling, and the matter was remanded for further proceedings. **U.S. v. Fincher, 538 F.3d 868 (8th Cir. 2008).** The specific remand directions are as follows:

> we remand this issue to the district court for further consideration of whether Fincher's wife has any ownership interest in the property and, if so, whether that affects Fincher's ownership of the property or the application of the Arkansas Homestead Exemption. Specifically, the district court must consider whether the entire 120 acres of real estate is protected by the Homestead Exemption, making Fincher eligible for court appointed counsel despite his ownership of the property, or whether the exemption protects only a portion of the real estate. . . . Additionally, the district court should consider whether Fincher has the current ability to reimburse the United States Treasury for the legal services he received in light of the transfer of the real estate to Fincher's daughters.

The Court has, as directed, given further consideration to these issues, and has reached the conclusions that follow.

3.  <u>Does Fincher's wife have an ownership interest in the Property</u>?

(a)  According to Fincher, the Property had been in his

---

[2] The Court rejects Fincher's various efforts to discount the appraised value of the Property. The Eighth Circuit found no error in this Court's conclusion that the appraised value of $455,000 was accurate, and that decision is now the law of the case. <u>Gander Mountain Co. v. Cabela's, Inc.</u>, 540 F.3d 827, 830 (8th Cir. 2008).

family for several generations.  At the January 20 hearing, the parties stipulated that before the execution of the January 29, 2007, Quitclaim Deed, Fincher's wife had no ownership interest in the Property.[3]

While Mrs. Fincher was deeded a life estate in the Property by the Quitclaim Deed, the Court finds, for reasons set forth in ¶5, *infra*, that the Quitclaim Deed is voidable as a fraudulent transfer.  Accordingly, the Court concludes that Mrs. Fincher acquired nothing more than a voidable life estate in the Property, an interest which can be avoided by the government in order to recover the attorney's fees Fincher is directed to pay by this Court.

(b)  The Court has also considered whether Mrs. Fincher, although having only a voidable ownership interest in the Property, nevertheless has some other interest in it, and concludes that she has both a dower and a homestead interest.

(i)  Although Fincher was the sole owner of the Property before the Quitclaim Deed was executed, Mrs. Fincher had an inchoate dower interest therein.  Under **A.C.A. §28-11-301**,

> (a)  If a person dies leaving a surviving spouse and a child or children, the surviving spouse shall be endowed

---

[3]The Court takes this stipulation into consideration not only for the fact it proves, but also as it bears on Fincher's credibility, noting that on appeal Fincher represented to the Eighth Circuit that he owned the property as a joint tenant with his wife.  Fincher also stated on his Financial Affidavit that he had not worked since 1985, but testified at the hearing that he had done some metal work over the years and made as much as $10,000 some years.  He also omitted mention of 20-24 weapons (worth over $5,000) on the Financial Affidavit.  These and other indicators of credibility cause the Court to have little confidence in the truthfulness of Fincher's testimony.

>of the third part of all the lands for life whereof his or her spouse was seized, of an estate of inheritance, at any time during the marriage, unless the endowment shall have been relinquished in legal form.
>
>(b)  A person shall have a dower or curtesy right in lands sold in the lifetime of his or her spouse without consent of the spouse in legal form against all creditors of the estate.

Ordinarily, when a married person sells real property, the conveyance thereof contains a relinquishment of the non-owner spouse's right of dower or curtesy.  There is, however, no requirement that the non-owner spouse relinquish a dower or curtesy interest when property is conveyed by the spouse who owns it, and a conveyance without the appropriate release does not deprive the non-owner spouse of dower or curtesy with respect to the property in question.  **A.C.A. §28-11-201.**

   (ii)  Likewise, where a homestead exists, it cannot be mortgaged or conveyed by a married person unless his or her spouse joins in the conveyance.  **A.C.A. §18-12-403.**  Thus, to the extent Fincher has a homestead interest in the Property, Mrs. Fincher has such as well.

   4.   <u>What is the effect of the Arkansas Homestead Exemption on Fincher's ownership of the Property</u>?

The Arkansas Homestead Exemption derives from the Arkansas Constitution, as fleshed out by Arkansas statutes.

The **Arkansas Constitution, Art. 9, §3,** provides that

>[t]he homestead of any resident of this State, who is married or the head of a family, shall not be subject to

> the lien of any judgment or decree of any court, or to sale under execution, or other process thereon, except such as may be rendered for the purchase money, or for specific liens, laborers' or mechanics' liens for improving the same, or for taxes, or against executors, administrators, guardians, receivers, attorneys for moneys collected by them, and other trustees of an express trust, for moneys due from them in their fiduciary capacity.

**A.C.A. §16-66-210**, tracks the Constitutional language, and then adds the following language relevant to the issues now before the Court:

> The homestead outside any city, town, or village, owned and occupied as a residence, shall consist of no more than one hundred sixty (160) acres of land, with the improvements thereon, to be selected by the owner. The homestead shall not exceed in value the sum of two thousand five hundred dollars ($2,500), but, in no event shall the homestead be reduced to less than eighty (80) acres, without regard to value.

**A.C.A. §16-66-210(c)(1).**

A homestead is not an estate or a vested interest in land, but rather an "exemption from legal process," intended to protect the family from want and to preserve the family home. **Middleton v. Lockhart, 344 Ark. 572, 580-81, 43 S.W.3d 113, 119 (2001).** Homestead laws are remedial and should be liberally construed to effectuate the beneficent purposes for which they were intended. **Tri-State Delta Chemicals, Inc. v. Wilkison, 75 Ark.App. 140, 142, 55 S.W.3d 304, 306 (2001).**

With these precepts in mind, the Court concludes that 80 acres of Fincher's Property -- to be selected by Fincher, as the

owner -- were exempt pursuant to the Arkansas Homestead Exemption when Fincher executed the Financial Affidavit.  The other 40 acres were not exempt, and were available to provide for Fincher's defense.

Fincher contends that he and his wife have separate homestead rights in the Property, such that each may claim a different parcel and they can "stack" two 80-acre homestead exemptions so as to encompass the entire 120-acre Property.  While creative, this argument is not justified by the language of **§16-66-210**, which allows the homestead "to be selected by the owner."  The Court has concluded that Mrs. Fincher was not the owner of the Property before the Quitclaim Deed of January 29, 2007, and could not before that date have selected the homestead. Even after the conveyance, she could not select a different homestead than her husband.  *Cf.* the remarks of Williams, District Judge, in **Rosenberg v. Jett**, **72 F.90 (8th Cir. 1894)**, cited with approval by the Arkansas Supreme Court in **Campbell v. Geheb**, **258 Ark. 225, 228, 523 S.W.2d 185, 187 (1975)**:

> . . . . while the husband and wife are not separated, but are living together as husband and wife, there can be no such thing as a separate homestead of the wife, separate and apart from her husband; that the domicile of the husband is the domicile of the wife, and wherever he may erect a homestead, it is, in the contemplation of the law, the homestead of the husband and wife....

The gender bias inherent in this statement has been discredited, but the notion that a married couple can have but one

homestead has not.  Indeed, the purpose of the homestead exemption, to protect the family home from creditors, justifies only one homestead at a time per married couple.

5. <u>Does Fincher have the current ability to reimburse the United States Treasury for the legal services he received in light of the transfer of the Property to his daughters</u>?

The Court finds that Fincher still has the ability to pay for his legal services, notwithstanding the transfer of the Property his daughters, because that transfer was fraudulent and, therefore, voidable.

**A.C.A. §4-59-204** provides, in relevant part, that

> [a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . .
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor:
>
> (ii) . . . believed or reasonably should have believed that he . . . would incur, debts beyond his . . . ability to pay as they became due.

Evidence taken at a previous hearing shows that after Fincher was convicted -- and while he was facing sentencing with the prospect of a fine that could be as much as $250,000 -- his family consulted attorney Jack Butt about the preparation of a deed conveying the Property to the Finchers' two daughters.  Transfer was accomplished by the Quitclaim Deed of January 29, 2007.

Recited consideration was $1.00 and "other good and valuable consideration." The Quitclaim Deed further recites "NO REVENUE STAMPS REQUIRED. TRANSFER IS BY GIFT."

Although both the Finchers and their daughters denied that the prospect of the fine had anything whatsoever to do with this conveyance, Fincher admitted that he wanted to get the property "out of my hands," and Fields admitted that they discussed the fact that if there was a fine and Fincher did not pay it, the Property could be taken to pay it.

At an earlier hearing, Fincher placed in evidence a letter from Butt to Assistant United States Attorney Chris Plumlee. The letter references a conversation between Butt and Plumlee about the fact that Fincher had been convicted; that he owned "a family farm in northwest Arkansas which has been in the family for many generations"; and that Butt had "been requested by the family to accomplish a transfer that would ensure its continued ownership by the family."

The testimony of Fincher and Fields, and the Butt letter, along with the close temporal coincidence of Fincher's conviction and the conveyance, are clear and convincing evidence that Fincher was trying to divest himself of the Property so that it would be unavailable to pay a fine in his criminal case. The Quitclaim Deed was fraudulent as provided in **A.C.A. §4-59-204(a)(1),** because it was made with actual intent to hinder the government -- should

it become a creditor by virtue of a fine -- from receiving payment. It was fraudulent as provided in **A.C.A. §4-59-204(a)(2)**, because it was made without receiving reasonably equivalent value and Fincher reasonably should have believed that he would incur a debt (a fine in the criminal case) beyond his ability to pay when it became due.

Fincher contends that a creditor cannot complain of fraud in the conveyance of a homestead, given that there are no creditors as to a homestead except those set forth in the Arkansas Constitution. **Davis v. Collums, 205 Ark. 390, 168 S.W.2d 1103 (1943).** While this is an accurate statement of the law, the principle does not protect the 40 acres of the Property which are not homestead. That portion of the Property is subject to the laws on fraudulent conveyances.

Under Arkansas law, a fraudulent transfer is voidable by the creditor to the extent necessary to satisfy the creditor's claim. The claim here is the Court's Order of July 27, 2007, directing Fincher to "pay into the United States Treasury the sum of $8,357.55 as reimbursement" for legal services he obtained wrongfully under the Criminal Justice Act. Forty acres of the Property is not protected by the Homestead Exemption. Using the most conservative of figures, this acreage is worth some $80,000.

Mrs. Fincher has a dower interest in this forty acres, but the Court does not find that such interest would compromise the

use of that acreage to pay Mr. Fincher's legals fees. Mrs. Fincher testified that she would pay for Fincher's attorney if she could. While this testimony was made in the context of her testimony that she had no cash with which to make such a payment, the Court finds it reasonable to believe it evidences a willingness to sell an asset (i.e., relinquish dower in the non-exempt portion of the Property) if by so doing she could pay for his defense. Should Mrs. Fincher be unwilling to relinquish her dower interest in the Property in order to allow its sale at fair market value, its sale value would obviously be significantly lessened, but the Court does not believe it would be reduced to such an extent that it would not cover the fees Fincher has been directed to repay the Treasury, particularly in light of evidence (see *infra*, ¶6) of other assets that could also be used to make this payment.

6. In addition to the foregoing analysis -- pursuant to which the Court is persuaded that Fincher currently has the wherewithal to pay for his legal defense based on the value of the Property -- evidence of additional assets emerged at the January 20 hearing, sufficient to persuade the Court that Fincher actively concealed assets to avoid having to liquidate them to pay for his defense, and that he still retains assets which (combined with the sale of the nonexempt Property) would cover the debt now due to the Treasury.

(a)  Fincher testified that at the time of his arrest, he owned 20 to 24 weapons, worth more than $5,000 but less than $10,000.  Fincher owned these weapons when he signed the Financial Affidavit, but did not list them.  He attempted to justify this omission by saying that they "were in the house" and he considered them "household property."  The Financial Affidavit asks whether the affiant owns "real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?"  The Court rejects the notion that firearms or other weapons could ever reasonably be considered to be "household furnishings."

These weapons could have been sold to pay for Fincher's defense instead of given away.  Fincher attempted to justify giving the guns to his daughters by saying that he could not own weapons as a convicted felon, but he was not prohibited from selling them prior to his conviction to raise money for his defense.

(b)  Fincher also testified that he has some wood- and metal-working machinery and tools, including lathes, planers, sanders, welders, drill presses, and radial arm saws.  He disparaged their worth, saying they were old and worn out and he doubted that the lot would bring $5,000.  He also offered the testimony of Paul Davis, who claimed to be familiar with machines and tools and their values.  Davis testified that if the machines and tools were

-12-

sold for scrap they would bring $2,000-2,500, while three of the machines could be sold as workable and would bring $1,500-2,000.

These assets would, according to Fincher's own estimates, bring in enough money to pay what the Court has directed Fincher to pay for his defense at trial. Fincher's failure to reveal these assets in a timely fashion, and to use them to pay for his defense, coupled with his disingenuous statement on the Financial Affidavit that the value of the Property was "unknown" when he knew that property in the vicinity had recently sold for $2,000 to $4,000 an acre, all persuade the Court that Fincher is not "financially unable to obtain adequate representation." Instead, these facts indicate that Fincher is simply not truthful and that he was trying to secure the services of a defense attorney at public expense, while retaining for himself and his family his considerable assets.

7.  Taking all the foregoing into consideration, the Court finds that Fincher was able to pay for his defense when he executed the Financial Affidavit, and that he is presently able to repay the United States Treasury for the cost of legal services he received at public expense, by selling, leasing, or mortgaging the non-exempt portion of the Property and, if necessary, selling various machines and tools.

8.  Based upon its review of the facts and the law applicable to the issues raised on remand, the Court concludes

that its initial judgment on the matter was correct: Fincher is not now, nor has he ever been at any time material to this proceeding, financially unable to obtain counsel to represent him in this proceeding.

**IT IS THEREFORE ORDERED** that Fincher pay into the United States Treasury the sum of $8,357.55 as reimbursement for legal services provided to him by attorneys appointed under the Court's Criminal Justice Act Plan.

**IT IS SO ORDERED,** this 26th day of February, 2009.

                                                /s/ Jimm Larry Hendren  
                                              **JIMM LARRY HENDREN**  
                                              **UNITED STATES DISTRICT JUDGE**